No. 2013-1476

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

TRITON TECH OF TEXAS, LLC,

*Plaintiff-Appellant,*

v.

NINTENDO OF AMERICA, INC.,

*Defendant-Appellee.*

**Appeal From The United States District Court
For The Western District of Washington In Case No. 13-CV-0157,
Honorable Richard A. Jones**

**CORRECTED BRIEF OF THE PLAINTIFF-APPELLANT**

TIMOTHY C. DAVIS
HENINGER GARRISON DAVIS, LLC
2224 1ST AVENUE NE
BIRMINGHAM, AL 35203
(205) 327-9115

JACQUELINE KNAPP BURT
JAMES F. MCDONOUGH, III
HENINGER GARRISON DAVIS, LLC
3621 Vining Slope, Suite 4320
Atlanta, GA 30339
(404) 996-0861

August 29, 2013          *Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF INTEREST

Counsel for Appellant, Triton Tech of Texas, LLC, certifies the following:

1.      The full name of every party or amicus represented by me is:

      Triton Tech of Texas, LLC.

2.      The name of the real party in interest represented by me is:

      Triton Tech of Texas, LLC.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me is:  None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the district court or agency or are expected to appear in this Court are:

      **Heninger Garrison Davis, LLC:**
      Timothy C. Davis
      Jacqueline K. Burt
      Steven W. Ritcheson
      James F. McDonough, III
      M. Blair Clinton

      **The Davis Firm P.C.:**
      William E. Davis, III

      **Phillips Law Firm:**
      R. Glenn Phillips

DATED: August 29, 2013

      Respectfully submitted,
      HENINGER GARRISON DAVIS, LLC

      */s/ Jacqueline K. Burt*
      Jacqueline K. Burt
      *Attorneys for Plaintiff-Appellant Triton Tech of Texas, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ................................................................ iv

TABLE OF ABBREVIATIONS AND NOTATIONS ........................................... v

INDEX OF JOINT APPENDIX ................................................................. vii

STATEMENT OF RELATED CASES ................................................... 1

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE .............................................................. 1

STATEMENT OF THE FACTS ............................................................ 2

A.    MR. GLYNN CONCEIVED THE IDEA OF A THREE-DIMENSIONAL INPUT DEVICE
      FOR A COMPUTER IN NOVEMBER OF 1987. ...................................... 2

B.    THE '181 PATENT INVENTION INCLUDES FOUR FUNDAMENTAL PROCESSES
      RELATED TO USE OF THE SIX SENSORS. ........................................... 5

SUMMARY OF ARGUMENT ............................................................. 8

STANDARDS OF REVIEW ............................................................... 9

ARGUMENT ................................................................................ 10

A.    THE STRUCTURES FOR "INTEGRATOR MEANS" AND "PROCESSING MEANS"
      ARE PLAINLY DISCERNIBLE AND UNDERSTOOD BY A POSITA, AND ARE,
      THUS, DEFINITE. ........................................................................ 10

      1.    The USPTO Examiner Declared That The "Numerical Integration"
            Structure For "Integrator Means" And "Processing Means" Were Well
            Known In The Art. .............................................................. 12

      2.    Even If The Examiner Had Not Explicitly Stated That Accomplishing
            The Numeric Integration Required For The "Integrator Means" And
            "Processing Means" Was Known In The Art, The '181 Patent
            Contains Ample Algorithmic Criteria For These Terms. ................... 14

B.    THE "COMMUNICATION MEANS" TEACHES UNI-DIRECTIONAL OR BI-
      DIRECTIONAL WIRELESS INTERFACES IN ADDITION TO THE SIX INTERFACE
      PORTS OR A SINGLE CABLE. ......................................................... 26

C.    WITHOUT ANALYZING WHETHER THE CLAIMS ARE ENABLED FOR AN INPUT
      DEVICE DEVOID OF HUMAN MANIPULATION, AND BY DISREGARDING THE

CLEAR TEACHINGS OF THE SPECIFICATION, THE WASHINGTON COURT
WRONGLY CONCLUDES THAT "INPUT DEVICE" OF CLAIMS 4 AND 19 NEED
NOT BE RESPONSIVE TO HUMAN MANIPULATION. ..........................................28

CONCLUSION ....................................................................................................30

CERTIFICATE OF COMPLIANCE.......................................................................31

CERTIFICATE OF SERVICE ...............................................................................32

ADDENDUM OF THE PLAINTIFF-APPELLANT ...................................... A-001

INDEX OF ADDENDUM............................................................................ A-002

# TABLE OF AUTHORITIES

## Cases

*Aristocrat Techs. Austr. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328 (Fed. Cir. 2008) ...................................................................................................14

*Atmel Corp. v. Info. Storage Devices, Inc*., 198 F.3d 1374 (Fed.Cir. 1999) ............9

*Creo Prods., Inc. v. Presstek, Inc.,* 305 F.3d 1337 (Fed. Cir. 2002) ......................17

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008) ...................................................................................................28

*Exxon Research and Eng'g Co. v. U.S.*, 265 F.3d 1371 (Fed. Cir. 2001) ........ 10, 17

*Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323 (Fed. Cir. 2008) ....................15

*In re Waldbaum*, 457 F.2d 997 (1972)...................................................................15

Markman v. Westview Instruments, Inc., *52 F.3d 967, (Fed. Cir. 1995) (*en banc*),* aff'd, *116 S. Ct. 1384 (1996)*..........................................................................9

*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011) ....................................10

*Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613 (Fed. Cir. 1985) ...................................................................................................11

*Typhoon Touch v. Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011) ............. 11, 12, 13, 15

*V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307 (Fed. Cir. 2005) ..........17

## Statutes

28 U.S.C. §1295(a)(1)..............................................................................................1

28 U.S.C. §1338(a) ..................................................................................................1

## Rules

Fed. R. App. P. 4(a)(1)(A) .......................................................................................1

Federal Circuit Rule 47.5 .........................................................................................1

# TABLE OF ABBREVIATIONS AND NOTATIONS

## *Parties*

| | |
|---|---|
| Triton or Plaintiff-Appellant | Triton Tech of Texas, LLC |
| Nintendo or Defendant-Appellee | Nintendo of America, Inc. |

## *Defined Terms*

| | |
|---|---|
| '181 Patent | U.S. Patent No. 5,181,181 |
| Asserted Claims | Claims 4, 5, 13-15, and 19 of the '181 Patent |
| Court | United States District Court for the Federal Circuit |
| Examiner | The United States Patent and Trademark examining agent for the '181 Patent |
| Glynn | Brian Glynn, inventor of the '181 Patent |
| June 4 Order | Claim construction order, Case No. C13-157RAJ, Dkt. No. 153 |
| LaBiche Patent | U.S. Patent No. 4,839,838 |
| MPF | Means-plus-function claiming |
| Olson Patent | U.S. Patent No. 4,787,051 |
| Opening Brief | Plaintiff Triton's Opening Claim Construction Brief, Case No. 2:10-cv-00328-JRG, Dkt. No. 115 |
| Owners | TTI is owned by Allen J. Montecino, Charles F. McBryde and Brian J. Glynn |
| Parties | Triton and Nintendo, jointly |
| POSITA | Person of Ordinary Skill in the Art |

| | |
|---|---|
| Reply Brief | Plaintiff Triton's Reply Claim Construction Brief, Case No. 2:10-cv-00328-JRG, Dkt. No. 122 |
| Response Brief | Nintendo's  Responsive Claim Construction Brief, Case No. 2:10-cv-00328-JRG, Dkt. No. 118 |
| Texas Court | United States District Court for the Eastern District of Texas, Honorable Rodney Gilstrap |
| TTI | Triton Technologies, Inc. |
| Washington Court | United States District Court for the Western District of Washington, Honorable Richard A. Jones |

### *Notations*

| | |
|---|---|
| Bold and Italics | Indicates emphasis added by Triton |
| A### | Indicates reference to Joint Appendix as submitted by Triton on August 27, 2013 |
| ##:## | Column : line number |

# INDEX OF JOINT APPENDIX
## (Pursuant to Fed. R. App. P. 30 and Fed. Cir. R. 30)

| *Appendix Range* | *Document Description* |
| --- | --- |
| JA001 - JA016 | U.S. Patent No. 5,181,181 |
| JA017 - JA161 | Prosecution history for U.S. Patent No. 5,181,181 |
| JA162 - JA180 | Plaintiff Triton's Opening Claim Construction Brief, Case No. 2:10-cv-00328-JRG, Dkt. No. 115 |
| JA181 - JA207 | Nintendo's  Responsive Claim Construction Brief, Case No. 2:10-cv-00328-JRG, Dkt. No. 118 |
| JA208 - JA217 | Plaintiff Triton's Reply Claim Construction Brief, Case No. 2:10-cv-00328-JRG, Dkt. No. 122 |
| JA218 | Letter from Triton Technologies, Inc. to Nintendo of America, Inc., dated October 6, 2006 |
| JA219 | Letter from Nintendo of America, Inc. to Triton Technologies, Inc., dated October 24, 2006 |
| JA220 - JA245 | Excerpts from Oral and Videotaped Deposition of Brian Glynn, dated January 20, 2012 |
| JA246 - JA269 | Docket Sheet from Case No. C13-157RAJ, United States District Court for the Western District of Washington, Honorable Richard A. Jones |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Triton provides as follows:

(a)    There have been no previous appeals in this case.

(b)    It is aware of no other case that will be directly affected by the Court's decision in this case.

## STATEMENT OF JURISDICTION

Triton invoked district-court jurisdiction under 28 U.S.C. §1338(a).  Final judgment was entered on June 27, 2013.  A-022.  Triton contests the Washington Court's June 27, 2013 Order, in which it found the '181 Patent invalid for indefiniteness.  A-020 – A-021.  Such finding resulted from the claim construction order dated June 4, 2013.  A-003 – A-019.  Triton timely appealed on June 27, 2013.  (Fed. R. App. P. 4(a)(1)(A)).  This Court has appellate jurisdiction under 28 U.S.C. §1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the Washington Court erred in concluding that the means-plus-function terms, "integrator means" and "processing means," were indefinite.

2.    Whether the Washington Court erred in construing the term "communication means" to exclude a "uni-directional or bi-directional wireless interface."

3.    Whether the Washington Court incorrectly concluded that the "input device" of claims 4 and 19 of the need not be responsive to human manipulation.

## STATEMENT OF THE CASE

The '181 Patent claims, generally, an input device that collects data using

motion sensors, along with a means for converting that data to useful information about the device's three-dimensional position, attitude (orientation) and motion, which then provides information to a computer. On August 30, 2010, Triton brought suit asserting infringement of the '181 Patent against Nintendo.

*Over the course of three years*, Triton endured three separate attacks on venue in the Texas Court before the case was eventually transferred to the Washington Court. The Texas Court issued the transfer order *just four days before it was scheduled to conduct a Markman hearing*. With claim construction briefing completed in the Texas Court, the Washington Court afforded Triton no opportunity to defend its proposed constructions in oral argument, finding instead that the briefing was sufficient to inform the court of the underlying technology.

Having no background on this case other than briefing previously submitted to the Texas Court, the Washington Court issued its June 4 Order, in which it found two of three MPF claim terms in the '181 Patent, "integrator means" and "processing means," indefinite. As the "integrator means" is present in all independent Asserted Claims, the Washington Court invalidated the Asserted Claims and entered judgment accordingly. Because final judgment was based on the Washington Court's erroneous claim constructions, both rulings were in error.

## STATEMENT OF THE FACTS

**A.    MR. GLYNN CONCEIVED THE IDEA OF A THREE-DIMENSIONAL INPUT DEVICE FOR A COMPUTER IN NOVEMBER OF 1987.**

In late November of 1987, Brian Glynn first *conceived* of the three-dimensional input device that now embodies the '181 Patent. JA231 at 52:15-19. The *idea* first occurred to Glynn several months prior. JA220-JA226 at 41:18 – 47:1; JA231-JA232 at 52:21 – 53:6. He a had concept for a business that would create something similar to a mouse that could manipulate graphic images on a computer by employing motion sensors, instead of the less-intuitive joystick/mouse/keyboard combination used at the time. JA231-JA233 at 52:15 – 54:20

Glynn decided to pursue the video gaming market in July of 1989. Recognizing opportunities in the video gaming market, Glynn undertook the task of drafting a patent application in August of 1989. Glynn memorialized in his draft patent application that by using both acceleration sensors to detect the linear movement of a mouse and also rotational rate sensors to detect the rotation (such as twisting), a mouse-typed device could be used as an effective tool for inputting three-dimensional movement (six degrees of freedom) to a computer. At that time, there existed relevant art in the field that disclosed employment of motion sensors in a mouse, such as the Olsen Patent and LaBiche Patent; however, this art used only accelerometers for motion detection. JA235-JA237 at 138:2 – 140:9. Glynn understood his approach to be better because his invention disclosed *direct* detection of rotation, where in the Olsen Patent and LaBiche Patent, "rotation is

obtained from the difference in translation acceleration sensed by the first accelerometer and a second accelerometer."  JA009 at 2:22-24; *see* JA108-JA110; *see also* JA235-JA237 at 138:2 – 140:9.  In addition, detecting rotation allows direct tracking of the gravity vector.  *Id.*  It was the use of rotational rate sensors that distinguished the '181 Patent from prior art (with regard to computer input, or mouse, devices).  Given these improvements, Glynn had a patentable invention.

On July 25, 1990, TTI was incorporated in Virginia and was operated by its Owners, who have worked together since the early 1980s.  JA238 at 172:4-18.  At the time of TTI's incorporation, the Owners had already begun creating a business plan, gathering investment funding, selecting prototype parts and finding technical support for development of the invention.  A final version of the patent application was filed on September 27, 1990, and even though business development slowed in 1991 and 1992 while TTI awaited issuance, the Owners worked tirelessly for four years to create a functional prototype of the invention, meeting with part suppliers, developing software, fabricating circuitry, and testing design variations.



The '181 Patent issued on January 19, 1993, and TTI substantially completed fabrication of its first prototype (shown to right) by late fall of 1995.  *See* JA234 at 114:9-12; JA244-JA245 at 232:2 – 233:16.  Attempting to leverage its

invention, TTI sought various licensing opportunities, including such with Nintendo. On October 6, 2006, TTI sent a letter pointing to Nintendo's interest in 3-D gaming technology and asked if Nintendo would be interested in a license. JA218. On October 24, 2006, TTI received a response from Nintendo's Manager of Intellectual Property rejecting any offer of a license. JA219.

In light of the numerous products appearing to incorporate its patented invention and with no licenses being inked, TTI saw litigation as its only recourse. On July 23, 2010, Triton was formed to accommodate Glynn who had moved to Crowley, Texas. *See* JA238-JA243 at 172:19 – 177:18. The '181 Patent was then assigned to Triton on July 27, 2010.

## B. THE '181 PATENT INVENTION INCLUDES FOUR FUNDAMENTAL PROCESSES RELATED TO USE OF THE SIX SENSORS.

Generally speaking, the '181 patented invention requires an input device (for providing information to a computer) that collects data along with a means for converting that data to useful information about the device's three-dimensional position, attitude and motion. There are four fundamental operational processes that are described within the '181 Patent specification. These four processes are (1) detecting,[1] (2) quantizing and storing,[2] (3) processing,[3] and (4)

---

[1] ***Detecting***. This process uses the six sensors to determine motion in all directions. The six sensors yield signals that vary depending on how the device is translated (moved, up, down, sideways), and rotated (in all ways one can vary its position, such as twisting). The specification explains that "[i]n accordance with one

communicating,[4] once each process begins, it is performed continuously over time

---

embodiment of the present invention, a computer input device apparatus detects and conveys to a computer device positional information within six degrees of motion-linear translation along, and angular rotation about, each of three mutually perpendicular axes of a Cartesian coordinate system." JA010 at 3:3-5; JA015 at 14:16–44. Recognizing those signals and how they vary constitutes "detection."

[2] ***Quantizing and Storing.*** This process is used to periodically convert the continually changing signals from their continuous (analog) forms to specific periodic (quantized) values that very closely represent the analog signals at the time they were digitized. Those values are collected, temporarily stored, and sent to a processor (in the order they arrived) from a first-in-first-out memory. The signals produced by the sensors are continuous and, being analog in nature, do not lend themselves to being processed by a digital computer. In order to later process them, those signals must be converted to digital values to enable such processing. This is the analog-to-digital conversion process. "Quantizing" the signals produces periodic digital "snapshot" values that can be stored and sent to a computer for further processing. JA015 at 14:45-51. In accordance with this reality, the patent discloses "an analog-to-digital converter which quantizes said analog rotation signals to produce digital rotational rate sensor values; a first-in, first-out buffer memory which temporarily stores said digital acceleration sensor values from said analog-to-digital converter in sequential order for later processing." *Id*.

[3] ***Processing***. This step accepts the stored sensor values from the first-in-first-out memory and integrates them over time to produce data that can be used to calculate position and attitude values. Since some sensors measure the force of gravity, that force must be mathematically "taken out" to enable executing final solutions. The specification details this process: "the processing element 34 periodically reads and numerically integrates the digitized sensor signals from the FIFO buffer memory 33." JA012 at 7:19-22. Next, the data is modified to cancel out the effects of gravity. That is, the gravitational contribution is subtracted from the translational values (acceleration) to compensate for gravity. The specification explains that angles from the rotational orientation are used to determine what portions of the acceleration values are attributable to gravity. JA013 at 9:59-10:7. "In addition to numerical integration, the processing element 34 computes and applies correction values which compensate for the effects of gravity and the translational effects of rotation on the linear sensors, *i.e.* both gravitational accelerations and tangential velocities." *Id.*, JA012 at 7:39-43.

[4] ***Communicating***. This process sends the stream of positional data to a computing device to enable conveying to the user the position of the input device. The

simultaneously for all six sensors for the duration of the operating session.  The specification includes detailed explanations of how each process is performed and how their execution yields relative position.  *See, supra,* fns. 1-4.  The three processes salient to this appeal are processing (encompasses the "integrator means" and "processing means"), communicating (encompasses the "communication means"), and detecting (encompasses the "input device").

During claim construction, the following terms were at issue:

(1) **"Input device."** The Washington Court found that the '181 Patent "does not limit the 'input device' to those that are 'responsive to human manipulation,'" therefore construing the term to mean "an apparatus for providing information to a computing device."  A-009.

(2) "**Communication means**" and "**integrator means,**" which are ***"associated with said input device…."***    After finding that the Parties misinterpreted the phrase "associated with said input device" in their proposed constructions, the Washington Court construed the term to mean "having an association with the input device, as opposed to merely an association with the

---

processor accepts data from the first-in-first-out memory and numerically integrates the data, yielding processed data that lend themselves to determining the changing positions of the input device.  Communication—information (including motion values) are communicated between the input device and the computing device.  Communication means associated with said input device for communicating information between said input device and said computing device.  *E.g.,* JA015 at Claim 19.

computing device (or other device)." A-013.

(3) **"Communication means," "integrator means,"** and **"processing means"** were disputed MPF terms. For each MPF term, the function was not in dispute, but the Parties disagreed on the corresponding structure disclosed in the specification. The Washington Court agreed with Nintendo and construed "communication means" as the six interface ports, a single cable, or their equivalents. A-016. For "integrator means," the Washington Court, concluded that the '181 Patent did not adequately disclose a structure corresponding to the claimed function. A-018. Specifically, it held the '181 Patent's disclosure of "numerical integration" is insufficient to describe the method of accomplishing the integrating function. *Id*. For the same reasons, the Washington Court also found disclosure for the structure corresponding to the "processing means" function inadequate. *Id*.

(4) **"Acceleration sensors"** and **"rotational rate sensors."** For these two terms, the Washington Court found the plain language in each of the claim elements disclosing the requirements for these sensors sufficient to define the terms. A-013.

## SUMMARY OF ARGUMENT

*First*, the Washington Court's conclusion that the MPF terms, "integrator means" and "processing means," were indefinite is incorrect because: (1) the

Examiner acknowledged that numeric integration as it pertains to the inventions of the '181 Patent were within the ambit of knowledge of a POSITA, and even if that were not the case, (2) the specification sufficiently discloses the requisite algorithmic criteria such that a person of ordinary skill in the art would be able to practice the claims using the sampling and accumulating steps, and (3) the processing means requires gravitational compensation that is plainly taught in the specification. **Second,** by disregarding the clear disclosure of wireless transmission in the specification, and the Examiner's acknowledgment of the same, the Washington Court erred in not construing the term "communication means" to include a "uni-directional or bi-directional wireless interface." **Third**, the Washington Court incorrectly concluded that the "input device" need not be "responsive to human manipulation" by (1) ignoring the fact that no embodiment disclosed in the specification contemplates non-human intervention and (2) not considering whether the '181 Patent enables the claims with respect to the same.

## STANDARDS OF REVIEW

Claim construction orders are reviewed *de novo*. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 983-984 (Fed. Cir. 1995) (*en banc*), *aff'd,* 116 S. Ct. 1384 (1996). Similarly, a decision holding a patent invalid for indefiniteness is reviewed *de novo*. *Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1378 (Fed.Cir. 1999).

# ARGUMENT

## A.    THE STRUCTURES FOR "INTEGRATOR MEANS" AND "PROCESSING MEANS" ARE PLAINLY DISCERNIBLE AND UNDERSTOOD BY A POSITA, AND ARE, THUS, DEFINITE.

In finding the Asserted Claims invalid based on its construction of the terms "integrator means" and "processing means" in its June 4 Order, the Washington Court did not afford the '181 Patent its statutory presumption of validity. With respect to a claim of invalidity based on indefiniteness, patent claims are only indefinite when they are shown, by clear and convincing evidence, to be "insolubly ambiguous" or not otherwise not "amenable to construction." *Exxon Research and Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). "[B]y finding claims indefinite only if reasonable efforts at claim construction prove futile, [the Federal Circuit] accord[s] respect to the statutory presumption of patent validity, and [it] protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." *Id.* A defendant seeking to overcome this presumption must persuade the factfinder of its invalidity defense by clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011). Indeed, "close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee." *Exxon Research*, 265 F.3d at 1380. The Washington Court did not respect this standard.

The level of specificity with which an algorithm for a particular MPF term must be disclosed must be viewed in light of its importance to the claim, the knowledge of a POSITA, and the prior art. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985). "[T]he amount of detail required to be included in claims depends on the particular invention and the prior art." *Id.* "In turn, the amount of detail that must be included in the specification ***depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention***." *Typhoon Touch v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (emphasis added).

In the present case, the "integrator means" and "processing means" are definite for at least two reasons. *First*, the non-novel nature of the requisite numeric integration of the "integrator means" and "processing means" make it unnecessary to further elaborate on how a POSITA would accomplish the same. The Examiner declared that a POSITA understood how to accomplish the numeric integration of the '181 Patent. *Second*, even if Examiner had not specifically acknowledged this, the concomitant algorithmic criteria for the "integrator means" and "processing means" are sufficiently disclosed in figures and related prose given that these MPF terms are not points of novelty of the Asserted Claims and must be understood with knowledge of a POSITA in the context of the particular invention and in light of the prior art.

**1.    The USPTO Examiner Declared That The "Numerical Integration" Structure For "Integrator Means" And "Processing Means" Were Well Known In The Art.**

As an introductory matter, it is important to note that the "integrator means" and "processing means" are not points of novelty for the '181 Patent. A brief review of the prosecution history of the '181 Patent makes this clear. Although the form of the claims were certainly modified over time, at no time were these two elements deemed novel or even substantively discussed in any way. *See, generally,* JA17-JA161. Moreover, as noted above, the law requires that the amount of detail that must be included in the specification for these non-novel limitations of the '181 Patent depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention." *C.f., Typhoon*, 59 F.3d at 1385. Under Nintendo's own definition, a POSITA for the '181 Patent "would have at least a Bachelor of Science degree, or the equivalent, in computer science, electrical engineering, physics, or a similar field" and experience in "the design of apparatuses and methods for inputting position, attitude and motion data to a computer." JA189.

With this in mind, defining a specific algorithm for numerical integration is unnecessary. Accomplishing numerical integration for the "integrator means" and "processing means" is something that, in light of the "subject matter that is described and its role in the invention as a whole, in view of the existing

knowledge in the field of the invention," a POSITA would handily accomplish. *C.f., Typhoon*, 59 F.3d at 1385.  In fact, the USPTO examiner himself specifically unequivocally declared this during prosecution of the '181 Patent.

To be more specific, in the '181 Patent's first office action, the examiner rejected the claims in reference the LaBiche Patent, et al., by declaring that LaBiche disclosed "pre-processing . . . by a computer to determine acceleration values which are converted to a series of acceleration, velocity and position values. Corrections are made to the measured values due to the influence of gravity . . . ." JA085, ¶17.  The Examiner then concluded that "***it would have been obvious to skilled artisans that integration must be performed to acquire velocity and positional data from the acceleration data.***"  JA086 at p. 5 ¶21. This unqualified declaration from the Examiner makes it unquestionable that a POSITA would understand how to perform numeric integration to achieve the results of the "integrator means" and "processing means" of the '181 Patent.

On a related note, it is pertinent to point out that Nintendo failed to direct the Washington Court to any evidence, expert of otherwise, that a POSITA would not have understood "numeric integration" in exactly the way the examiner did. *Typhoon*, 59 F.3d at 1385 ("The defendants have directed us to no evidence that a programmer of ordinary skill in the field would not understand how to implement this function.").  For all of these reasons, it is clear that the Washington Court had

no basis to conclude that a POSITA would not have understood the "numeric integration" contemplated by the "integrator means" and "processing means."

> **2.** **Even If The Examiner Had Not Explicitly Stated That Accomplishing The Numeric Integration Required For The "Integrator Means" And "Processing Means" Was Known In The Art, The '181 Patent Contains Ample Algorithmic Criteria For These Terms.**

Even if one could conclude, despite explicit recognition by the Examiner that the specification is definite with respect to the "integrator means" and "processing means," that a POSITA did not have the knowledge to accomplish these limitations, the numeric integration required to accomplish the "integrator means" and "processing means" are plainly disclosed in the specification in such a way that it would be straightforward for a POSITA to accomplish.[5]  In *Typhoon,* this Court stated that an algorithm may be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other

---

[5] For clarification purposes, Triton did not address *Aristocrat* in the proceedings before the Washington Court because that case has no bearing on the issues presented here.  Unlike the case here, *Aristocrat* applies to a situation where the patentee chose not to disclose any algorithm for a particular MPF term. ***This case is squarely governed by Typhoon, not Aristocrat***.  Compare, *Typhoon*, 659 F.3d 1376, with *Aristocrat Techs. Austr. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328 (Fed. Cir. 2008).  As noted above, the Examiner explicitly declares that the performance of "numeric integration" was well known by a POSITA, and as such, Triton was not required to disclose an algorithm for the "numeric integration" used by the "integrator means" and "processing means."  Moreover, even if Triton was required to disclose an algorithm to this non-novel limitation of the '181 Patent, Triton clearly indicated the algorithmic criteria that applies to the requisite "numeric integration" of the "integrator means" and "processing means."

manner that provides sufficient structure." 659 F.3d at 1385 (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)) (citations omitted). "A description of the function in words may 'disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under §112, ¶ 6.'" *Typhoon,* 659 F.3d at 1384-1385 (citing *Finisar*, 523 F.3d at 1340); *see also, In re Waldbaum*, 457 F.2d 997, 998 (1972) ("algorithm" in computer systems has broad meaning that includes "in essence a series of instructions for the computer to follow"). As the Washington Court recognized, the "integrator means" of Claims 4 and 19 perform the function of "integrating [various signals] over time to produce [other signals]." A-0016.

The specification points to structure for performing integration: a "conventional microprocessor having a suitably programmed read-only memory" or a "suitably programmed conventional digital signal processor." JA012 at 7:15-19. Claim 5 elaborates on claim 4 by requiring that the integrator means "numerically integrate[]" the "digital acceleration sensor values." JA014-JA015. Similarly, the "processing means" of Claim 13 serves the function of "compensating for acceleration detected by [the claimed] acceleration sensors attributable to gravitational acceleration forces." *Id.* As with the "integrator means," the specification points to structure for performing processing: a "conventional microprocessor having a suitably programmed read-only memory"

or a "suitably programmed conventional digital signal processor." *Id.* At both Claim 5 and in numerous places in the specification, the '181 Patent discloses "numerical integration" as a method of accomplishing those functions. A-018.

Despite the disclosure of these specific structures, and in deeming these terms indefinite, the Washington Court contended that the '181 Patent's disclosure of "numerical integration" is insufficient, claiming that numerical integration "is not a single algorithm, but rather a whole class of algorithms that can be used to calculate definite integrals for various functions." *Id.* The Washington Court concluded that "Triton Tech can point only to a 'suitably programmed' microprocessor" for its structure. In doing so, the Washington Court did not properly apply binding Federal Circuit law to the record before it.

> **a. Given the level of specificity required and the broad definition of an algorithm under the law for the '181 Patent, the specification clearly discloses the *sampling* and *accumulating steps* required to achieve the "integrator means" and "processing means."**

The specification teaches the steps of sampling and accumulating sensor inputs that support the "numeric integration" structure of the "integrator means" and "processing means" functions. In determining whether sufficient algorithmic criteria is disclosed, the correct focus is "whether one skilled in the art would have understood that the specification of each patent disclosed structure capable of performing the function recited in the claim limitation." *Creo Prods., Inc. v.*

*Presstek, Inc.,* 305 F.3d 1337, 1347 (Fed. Cir. 2002); *see also, V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention").  This Court, recognizing the ease with which patent claims can later be criticized, stated in *Exxon,* 265 F.3d at 1375 that "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."

### i.    A primer on the '181 Patent's numeric integration.

At the outset, it is important to note that numeric integration, as described in the '181 Patent, is not of the class of "definite integrals" that Nintendo espoused (and the Washington Court embraced).  The Washington Court, without holding a hearing to better understand the technology, broadly claimed that "'[n]umerical integration' . . . is not a single algorithm, but rather a whole class of algorithms that can be used to calculate definite integrals for various functions." A-018.  It further stated that "[a]lthough a [POSITA] might be able to choose an appropriate numerical integration algorithm and program it on a microprocessor, the ['181] Patent discloses no algorithm at all." *Id.*  But the classification the Washington Court appears to have accepted requires a known equation of the function (with

known limits) to be integrated (approximated by various methods, e.g., Monte Carlo, Runge-Kutta, Simpsons Rule, etc.), which is not taught by the '181 Patent.

For the '181 Patent, a POSITA would understand that the patent guides the potential designer through the steps—the algorithmic criteria—to enable production of the desired result. *See, infra,* Argument, Section A.2.a.ii.  Numerical



integration refers to the well-known process of accumulating values that represent the areas under a set of sampled values over time.  As the sensor produces the values represented by the curve, one periodically samples those values and calculates the area under the curve for each period of time.   Each period of time is labeled with a value of $t_n$ (the sample interval), and each area in the figure is represented by a rectangle (sampled value multiplied by the sample interval).  All methods of practically accomplishing numeric integration include solutions that entail time-specific snapshots of how the characteristic of a signal changes over time.  This accomplished by estimating a value to represent each time-specific snapshot of the magnitude of the signal characteristic being measured.  As the Examiner noted, when those skilled in the art are taught that numerical integration is required during processing, this is their

understanding. *See, supra.* Argument, Section A.1[6]

### ii.    The sampling and accumulating used for numeric integration are plainly taught by the specification.

Understanding this foundational concept, the steps that a POSITA would know to undertake are also, in fact, clearly described in the specification.   As can be ascertained by a cursory review of the specification, numeric integration is at the core of the many operations taught by the '181 patent. *See, generally,* JA001-JA015.  And as any person of ordinary skill in the art would surmise, the operation of integration is comprised of two steps: (1) Sampling and (2) Accumulating.[7]  The first step in the numeric integration of the '181 patent is sampling the value that is to be integrated.  *See, infra,* Argument, Section A.2.b.ii, Sampling Step.   These sampled values are drawn from computer memory.  *Id.*  In the next step, sampled

---

[6] Given the Washington Court's confusion, the provision of an everyday example of this integration, using the sampling and accumulating steps, is appropriate.  If a person driving down the road at 60 miles-per-hour (a mile a minute) glances at the speedometer each minute (sampling the velocity at a rate of one sample per minute), they will see that the accumulated value of the distance traveled (as shown by the odometer) will have increased by one mile.  In this manner, the function of integrating the velocity is being performed by accumulating the speed over time with the odometer.  This is analogous to the integration that is being performed in the '181 patent (resetting the odometer is the same as "clearing numeric integration accumulators and setting initial condition registers to zero" as set forth in the '181 Patent). JA012 at 7:67-8:1.

[7] Before sampling, "[t]he conversion of both the linear acceleration and rotational rate information is accomplished via an analog-to-digital converter, which feeds digital information into a buffer memory." A-005.  With no disagreement between the parties concerning the meaning or intent by the '181 patent of either analog-to-digital conversion or storage of values in buffer memory, the integration steps of concern are (1) sampling and (2) accumulating.

values drawn from memory are accumulated (or added or summed).  *See, infra,* Argument, Section B.2.b.ii, Accumulating Step.  These accumulated values are themselves maintained in memory (accumulators).  *Id.*  To a POSITA, it is well understood that the sampling interval is applied to the values in this accumulation. *Id.* This is disclosed by the numerous references to "integrating over time" in the '181 Patent.  *See, infra,* Argument, Section B.2.b.ii., Sampling Step.

*(1) Sampling Step.*  Sampling of values required to undertake the numeric integration contemplated by the '181 Patent is taught in the area of the specification that describes Figure 6, which states:

> Process 2.1 . . . ***acquires the instantaneous values*** of the time varying three-dimensional motion signals from the sensors. In the preferred embodiment of the present invention, where the acquired motion signals are analog, the ***sensor outputs are periodically sampled*** and quantized. In process 2.2, the quantized signals for all six degrees of motion in three dimensions are formatted into digital values representing instantaneous three-dimensional information and ***stored for further processing***.

JA013 at 9:28-37.  This use of "instantaneous" values implies continuous updating, and thus the sampling that it entails.  In the '181 Patent's "Summary of the Invention," this is indicated by the following:

> Additional aspects of the preferred embodiment of the present invention include techniques for producing velocity and position vectors of the input device. These vectors, each consisting of a scalar magnitude and a direction in terms of a three-dimensional Cartesian coordinate system, are to ***reflect the instantaneous*** input device ***velocity*** as well as its ***position and attitude***, relative to an arbitrary stationary initial position and attitude.

JA010 at 3:30-38.  This further elaborated upon in the description of Figure 5, which, in relevant part, states that "signals are converted to *instantaneous values and stored.  These stored instantaneous values are subsequently passed to process 3 where computations are made* to generate the three-dimensional motion and position data. . . ."  JA013 at 9:2-6.  In the description of the decomposition of process 3 in FIG. 7, the patent specification further teaches that:

> The *instantaneous three-dimensional information*, consisting of a translational acceleration value and a rotational rate value for each of the three axes, is provided in digital format by process 2 of FIG. 5. The translational acceleration data is passed to process 3.1, and the rotational rate data is passed to processes 3.1, 3.2 and 3.3. Process 3.1 numerically integrates over time the *instantaneous* rotational velocity *values* for each of the X, Y and Z axes, resulting in a rotational displacement value for each axis, representing the motion sensing assembly attitude.

JA013 at 9:49-59.  Thus, a detailed review of the '181 Patent specification more than adequately describes the process a POSITA would have known to have undertaken with respect to the Sampling Step.

**(2) Accumulating Step.**[8]  The first disclosure in the '181 Patent that teaches the accumulating of values occurs in the description of the block diagram depicted in FIG. 4.  The prose describes an embodiment where depressing a mouse button executes a command "clearing all *numeric integration accumulators* and setting initial condition registers to zero, thereby causing future position and attitude

---

[8] This step could also be described as summing continuously.

computations to be relative to a new physical location and attitude of the mouse."

JA012 at 7:65-8:3.  This specification further teaches:

> When initiated by external commands received from the computer, process 3.3 will reset to zero, or hold to a constant, the values contained in the initial conditions data store which describe the initial position and attitude of the three-dimensional mouse. Upon command from the computer 23, the internal **accumulators used for the numerical integration** of the position and attitude data will be reset to zero. This will have the effect of making the initial position coincident with the current position and attitude of the mouse. Subsequent position calculations in process 3.3 would be relative to this new initial position and attitude.

JA013 at 10:51-62.  The specification further teaches integration being performed continuously, emphasizing the continuous accumulation inherent in the numeric integration disclosed in the '181 Patent.  In the prose describing FIG. 4, the '181 Patent teaches that:

> Three-dimensional motion, position and attitude values are **continually computed** in a known manner **based on the most recent results of the numerical integration** of the sensor data, the current zero position and attitude information . . . . Numerical **integration is performed continually** on the digital acceleration and rotational rate values provided by the sensors . . . .

JA012 at 7:21-36 and 8:11-12.   Given that the skilled artisan for these inventions is experienced in "the design of apparatuses and methods for inputting position, attitude and motion data to a computer" (*see, supra,* Argument, Section A.1), such a person would understand exactly the application of numerical integration in the '181 Patent.  The Examiner acknowledged this, and Triton respectfully requests

this Court do the same.

    **b. The Washington Court improperly conflated its discussion of the "integrator means" and the "processing means," and ignored the "gravitational compensation" requirement of the "processing means."**

The Washington Court avoided any specific analysis of the "processing means" by imputing its analysis of the "integrator means" to "processing means" and concluding that the "processing means" was indefinite. To be more exact, in construing the "processing means," the Washington Court's treatment of the term was limited to the following statement: "Triton Tech points to the same 'suitably programmed' processors to satisfy its disclosure obligations. For the reasons the court has just discussed [for 'integrator means'], that disclosure is inadequate." A-018. However, this superficial conclusion completely ignores the fact that the processing means function performs the additional role of gravitational compensation.[9] This alone evinces the Washington Court's legal error.

Putting that aside, in addition to the reasons stated above as to why "numeric integration" is sufficiently taught with respect to both the "integrator means" and "processing mean," the '181 Patent adequately discloses gravity compensation for

---

[9] As noted in Argument, Section A.2, the Washington Court acknowledged that the "processing means" of Claim 13 serves the function of "compensating for acceleration detected by [the claimed] acceleration sensors attributable to gravitational acceleration forces." As the Washington Court's construction for "integrator means" does not address gravitational compensation, its findings with respect to the same are factually deficient with as to the "processing means."

two reasons. First, as was the case with "numeric integration," the Examiner acknowledged that gravity compensation with respect to the processes of the '181 Patent is well known in the art. Indeed, the Examiner noted that the LaBiche Patent, et al., "disclose the compensation for gravitational forces in the computations" and further noted that "[c]orrections are made due to the measured values due to changes in the influence of gravity as the device rotates" JA085 at ¶22; JA087 at ¶16. Accordingly, the references on the face of the '181 Patent disclose gravity compensation, and as such, skilled artisans would have understood how to accomplish the same.

Second, even if that were not the case, the '181 Patent's specification sufficiently discloses the algorithmic criteria underlying the "gravitational compensation." To be more exact, in reference to Figure 3 in the '181 Patent (as represented below), the specification describes in detail how the preferred embodiment compensates for gravity in detail sufficient for a POSITA to accomplish:



Process 3.1 *numerically integrates over time* the instantaneous rotational velocity values for each of the X, Y and Z axes, resulting in a rotational displacement value for each axis, representing the motion sensing assembly attitude. Process 3.1 *uses this attitude information to compensate for the gravitational effect of the earth on the translational acceleration sensors*.  . . . . In general, *when a translational acceleration sensor axis is oriented to a nonzero angle with respect to a perpendicular of the local gravitational force, then some portion of that force will be detected by the sensor. Based on the computed attitude of the sensors, process 3.1 will compute and compensate for that portion of acceleration* detected by each translational acceleration sensor which is attributable to the force of gravity. Process 3.1 then *numerically integrates in a conventional manner* these compensated translational acceleration values for each of the X, Y, and Z axes to produce a translational velocity value for each of the three dimensions.

JA013 at 9-55-10:11.  The specification further teaches that "[p]rocess 3.3 takes the velocity vector from process 3.2, *numerically integrates it over time*, and computes the translational displacement for each axis." JA013 at 10:43-45.

As noted in the above citations to the specification, the entire force of gravity will be measured by a sensor pointing up and zero force of gravity will be imparted on an acceleration sensor laying flat or "perpendicular of the local gravitational force." JA013 at 10:1-2. As such, a skilled artisan could accomplish the gravitational compensation done by the "processing means." For these reason, the "processing means" MFP term is definite.

B.    **THE "COMMUNICATION MEANS" TEACHES UNI-DIRECTIONAL OR BI-DIRECTIONAL WIRELESS INTERFACES IN ADDITION TO THE SIX INTERFACE PORTS OR A SINGLE CABLE.**

The specification of the '181 Patent teaches that the "communication means" may include uni-directional or bi-directional wireless interfaces.   By disregarding the fact that communication through known wireless communications techniques was also disclosed, the Washington Court erred in its construction "of the 'communication means' as the six interface ports, or a single cable, or their equivalents."   A-016.   To be clear, contrary to the Washington Court's conclusion, Triton does not rely on the "lightning bolt" as a "stand in for structure."   *Id.*   While it is true that a "lightning bolt" symbolizes wireless communication techniques, and wireless communication can certainly perform a "function" in the colloquial sense, within the context of the '181 Patent, it provides structure for the function of the "communication means."   *See* JA004 at Fig. 3.

The specification is explicit on this point.   When discussing Figures 1(a) through 1(g), which is the exact portion of the specification (and figures) cited by the Washington Court to support its "six interface ports" and "single cable" construction, the specification states that "[e]ach of [the six] interface ports may provide communication with the computer through known wireless communication techniques, such as infrared or radio techniques."   JA013 at 9:8-14.   Moreover, the specification discloses a "wireless interface" that is "[p]referably . . bi-directional."

JA010 at 4:8-17; and 4:14-17 ("the interface is bi-directional, allowing the computer to control certain aspects of the input device operational states.); JA013 at 9:7-9 (referring to FIG. 5, "process 4 handles all communications between the mouse 1 and the computer 23 via a bi-directional link 21.").[10]    Even the Washington Court itself (inadvertently) added further contours to this embodiment by stating that "the 'wireless interface' is illustrated with a schematic lightning bolt between the transceiver of the invention (comprised of the six interface ports) and the transceiver of the computer." A-016.

The Washington Court might have construed this claim correctly but for a single fundamental error of definitional scope. The Washington Court labeled as a "function" what is clearly disclosed as a structure of the "communication means" and then concluded that this "function" had no structure. *Id*. But this is the equivalent of labeling as a "function" the "six interface ports" or "single cable" and then concluding that these "functions" have no structure. If the Court had properly defined the relative scope of the "wireless interface" with respect to the "communication means," it would have correctly construed the term to include uni-directional or bi-directional wireless interfaces in addition to "the six interface

---

[10]    The Examiner also explicitly acknowledged that the use of wireless communication was well known in the art. "Baker et al and Mori disclose the use of wireless communication in the detection of position and motion data to a remotely associated computer. . . . [I]t would have been obvious to skilled artisans to incorporate this idea into all input devices for ease of movement." JA085-JA086 at ¶¶19-20.

ports, or a single cable, or their equivalents."

**C.    WITHOUT ANALYZING WHETHER THE CLAIMS ARE ENABLED FOR AN INPUT DEVICE DEVOID OF HUMAN MANIPULATION, AND BY DISREGARDING THE CLEAR TEACHINGS OF THE SPECIFICATION, THE WASHINGTON COURT WRONGLY CONCLUDES THAT "INPUT DEVICE" OF CLAIMS 4 AND 19 NEED NOT BE RESPONSIVE TO HUMAN MANIPULATION.**

The "input device" of claims 4 and 19 of the '181 Patent must be responsive to human manipulation as indicated by the specification, the claims, and the prosecution history. By (1) ignoring the fact that no embodiment disclosed in the specification contemplates anything other than human intervention and (2) not considering whether the claims of the '181 Patent are enabled with respect to the same, the Washington Court erred in concluding that the "input device" of claims 4 and 19 of the '181 Patent need not be "responsive to human manipulation." With regards to questions such as these, this Court has held that it

> must read the specification in light of its purposes in order to determine "whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent. Ultimately, [the] focus remains on understanding how a person of ordinary skill in the art would understand the claim terms.

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1308 (Fed. Cir. 2008). A thorough perusal of the specification of the '181 Patent shows that every single teaching of the patent is directed to human use of the device. JA167-JA168. And no embodiment discusses anything other than human operation of the

device.[11]  *See, generally,* JA001-JA015; A-009.

But this is not the only problematic aspect of the Washington Court's construction.  An equally troubling error the Washington Court made is failing to consider whether the full scope of *its own* construction was enabled.  While the Washington Court was quick to conclude that wireless transmission for "communication means" was not disclosed in the specification (despite prose and figures describing the same), with respect to the "input device," the Washington Court simply concluded that "the patent discloses no prohibition to an input device attached to, for example, a pet or weathervane."  A-009.

In other words, the Washington Court did not perform the inverse analysis for "input device."  If Triton had asked for a construction that included, for instance, "weathervanes," and the Washington Court used the same analysis it did for concluding that the "communication means" did not encompass wireless transmission, the Court likely would have concluded that a construction including weathervanes was not supported by the specification.  While the Washington Court

---

[11] In finding that "the ['181] Patent does not limit the 'input device' to those that are 'responsive to human manipulation,'" the Washington Court relied on statements in the specification "that 'other variations are possible,' including a device 'mounted on a helmet to detect head movements' and 'foot and/or leg-mounted' devices" but stated that "the ['181] Patent discloses those possibilities without limitation, noting that '[o]ther arrangements will also be apparent to the skilled practitioner.' A-009.  However, it ignored the fact that all of these statements are provided in the same paragraph as, and in reference to, "the hand-held device."  JA014 at 11:44-51.  In other words, these are additional embodiments of devices manipulated by a human operator.

cited *Phillips* for the proposition that "embodiments, even preferred embodiments, do not limit claims," it ignored the fact that it must also attempt to construe a term such that it is valid—and claims must be definite to be valid.

A quick reference to the Washington Court's own examples is illustrative. As noted in the specification, the entire point of the '181 Patent is to enable the input of 3D movement.  But a weathervane, for example, records the direction of wind, a measurement encompassing two dimensions.  Similarly, it could be argued that mounting a device on a pet, for instance, might present problems outside the purview of the skilled artisan's knowledge that are not addressed by the specification.  For these reasons, the "input device" of the '181 Patent is limited to human manipulation.

## CONCLUSION

For all the reasons discussed herein, Triton respectfully requests that the Court find in favor of Appellant Triton on all issues raised in this appeal.

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e) because it contains 7,487 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: August 29, 2013

*/s/ Jacqueline K. Burt*
Jacqueline K. Burt
*Attorney For Plaintiff-Appellant*
*Triton Tech of Texas, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2013, I filed or caused to be filed the foregoing Brief of the Appellant with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served or caused to be served a copy on all counsel of record by the CM/ECF system and electronic mail.

Dated: August 29, 2013                    Respectfully submitted,

*/s/ Jacqueline K. Burt*
Jacqueline K. Burt
Heninger Garrison Davis, LLC
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Telephone: (404) 996-0861
Facsimile: (205) 547-5502
*Attorney For Plaintiff-Appellant*
*Triton Tech of Texas, LLC*

No. 2013-1476

IN THE
## UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

TRITON TECH OF TEXAS, LLC,

*Plaintiff-Appellant,*

v.

NINTENDO OF AMERICA, INC.,

*Defendant-Appellee.*

**Appeal From The United States District Court
For The Western District of Washington In Case No. 13-CV-0157,
Honorable Richard A. Jones**

**ADDENDUM OF THE PLAINTIFF-APPELLANT**

TIMOTHY C. DAVIS
HENINGER GARRISON DAVIS, LLC
2224 1ST AVENUE NE
BIRMINGHAM, AL 35203
(205) 327-9115

JACQUELINE KNAPP BURT
JAMES F. MCDONOUGH, III
HENINGER GARRISON DAVIS, LLC
3621 Vining Slope, Suite 4320
Atlanta, GA 30339
(404) 996-0861

*Attorneys for Plaintiff-Appellant*

## INDEX OF ADDENDUM

| *Range* | *Document Description* |
| --- | --- |
| A-003 – A-019 | Claim construction order, Case No. C13-157RAJ, Dkt. No. 153 |
| A-020 – A-021 | Order, Case No. C13-157RAJ, Dkt. No. 155 |
| A-022 | Judgment in a Civil Case, Case No. C13-157RAJ, Dkt. No. 156 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRITON TECH OF TEXAS, LLC,

     Plaintiff,

     v.

NINTENDO OF AMERICA, INC.,

     Defendant.

NO. C13-157RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' request that the court construe disputed terms in United States Patent No. 5,181,181 (the "'181 Patent" or the "Patent"). The court has reviewed the parties' briefs and supporting materials. The court has previously advised the parties that neither oral argument nor an evidentiary hearing is necessary to construe the disputed terms.

## II. BACKGROUND

The '181 Patent, which issued in 1993, covers a device that sends three-dimensional data to a computer. The preferred embodiment of the invention is a three-dimensional version of the ubiquitous computer "mouse." Whereas a conventional mouse communicates positional information in only two dimensions (typically along the plane defined by the computer user's desk, table, or other operating surface), the preferred embodiment of the '181 Patent is a mouse that communicates positional information in three dimensions.

ORDER – 1

Plaintiff Triton Tech of Texas, LLC ("Triton Tech") holds the rights to the '181 Patent.[1] It contends that Defendant Nintendo of America Inc. ("Nintendo") infringes the Patent with controllers for its home video game systems. The court need not consider the infringement dispute in this order, which concerns only the interpretation of certain terms in the '181 Patent.

The Patent contains 21 claims, four of which (claims 1, 4, 19, and 20) are independent. Triton Tech asserts only claims 4, 5, 13-15, and 19 against Nintendo. The asserted independent claims are lengthy and the court declines to recite them here. The court offers a summary, however, solely for the purpose of placing the disputed claim terms in context.

Claims 4 and 19, broadly speaking, require an input device (for providing information to a computer) that collects data along with a means for converting that data to useful information about the device's three-dimensional position. The input device itself consists of three "acceleration sensors" that measure linear acceleration along three mutually perpendicular axes. These sensors output signals that can be converted into information about the position of the device in three-dimensional space and the three dimensional velocity (*i.e.*, speed plus direction) of the device. These data, however, are insufficient to fully describe three-dimensional movement. Position and velocity only tell part of the story: the attitude of a moving object matters as well. As an illustration, the court notes that a pilot may be less interested in the velocity of a plane and its location above the earth than in whether the plane is flying upside down. To convey attitudinal information, claims 4 and 19 also require three "rotational rate sensors" that measure the rate at which the device rotates about each of the three mutually perpendicular axes. Signals from those sensors can be converted into information about the device's attitude

---

[1] The '181 Patent lists Triton Technologies, Inc., as its assignee. Although the court is aware of no evidence establishing Triton Tech's right to enforce the patent-in-suit, no one disputes it for purposes of claim construction.

ORDER – 2

and changes in attitude. The conversion of both the linear acceleration and rotational rate information is accomplished via an analog-to-digital converter, which feeds digital information into a buffer memory, along with an "integrator means," which translates linear acceleration data into velocity or position data and which translates rotational rate data into attitude data. Finally, the invention requires a "communication means" for transmitting data between the input device and the computing device.[2]

The court summarizes the claim terms that the parties dispute before analyzing and resolving those disputes:

1) Independent claims 4 and 19 disclose in their preambles an "input device for providing information to a computing device . . . ." The parties dispute what "input device" means.

2) The disputed independent claims further disclose "communication means" and "integrator means" that are "associated with said input device . . . ." The parties dispute whether the limitation "associated with said input device" demands that the specified means be located somewhere other than the computing device to which the claimed input device provides information.

3) As the court has already noted, the disputed independent claims require three "acceleration sensors" and three "rotational rate sensors" within the claimed input device. The disputed independent claims themselves contain a description of the properties of these six sensors, and Nintendo believes that description suffices. Triton Tech believes otherwise.

---

[2] With a minor exception, which the court discusses in Part III.B, *infra*, differences between claim 4 and claim 19 are immaterial to the parties' claim construction disputes. Briefly, claim 4 explicitly requires "analog" electrical signals from the linear acceleration sensors, and requires no specific output from the rotational rate sensors. The analog-to-digital converter, buffer memory, and integrator means process only data from the linear acceleration sensors and produce only positional data. In claim 19, by contrast, the linear acceleration signals are not explicitly "analog," the rotational rate sensors produce "analog signals having values proportional to the detected rate of rotation," and the analog-to-digital converter, buffer memory, and integrator means combine to produce data on both position and attitude.

ORDER – 3

4) Finally, the parties raise several related disputes over the "integrator means," (which appears in claim 5 along with the disputed independent claims), the "communication means" (which appears in the disputed independent claims), and the "processing means" of claim 13 (which is a means for "compensating for acceleration detected by [the] acceleration sensors attributable to gravit[y]." The parties agree that each of these claim elements is in the means-plus-function format proscribed at 35 U.S.C. § 112(f). They disagree, however, as to what "structure, material, or acts" correspond to the claimed means.

The court now considers both the law governing claim construction and the application of that law to the parties' disputes.

## III. ANALYSIS

The court begins by reciting basic claim construction principles. The specification of a patent begins with a written description, which often includes drawings or illustrations, and "conclude[s] with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). The claims reign supreme over the remainder of a patent; they alone "define the scope of patent protection." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) ("[A] patent applicant defines his invention in the claims, not in the [remainder of] the specification."); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257-58 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention.").

The court alone determines what patent claims mean. In *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), the Supreme Court held that claim construction "is exclusively within the province of the court." In *Markman*'s wake, the Federal Circuit has clarified that claim construction is a "pure issue of law," despite any

ORDER – 4

"factual underpinnings" or "allegedly fact-based questions relating to claim

construction." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998)

(holding that de novo review applies to all claim construction issues).

Whereas the claims alone define the scope of the invention, construing the claims

requires the court to start with the language of the claims, but also to look elsewhere.

The Federal Circuit's en banc decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.

Cir. 2005), provides comprehensive instructions for navigating evidence relevant to claim

construction. The court begins with the language of the claims themselves, which

"provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314;

*Amgen Inc. v. Hoechst Marion Roussell, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006)

(citing *Phillips* for the proposition that "claim construction must begin with the words of

the claims themselves"). The court should "generally give[] [claim terms] their ordinary

and customary meaning" in the eyes of a person of ordinary skill in the art as of the filing

date of the patent. *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics Corp. v.

Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed Cir. 1996)). In some cases, the ordinary

meaning "may be readily apparent even to lay judges," in which case the claim

construction "involves little more than the application of the widely accepted meaning of

commonly understood words." *Id.* at 1314.

Beyond the claim language, the remainder of the specification is "always highly

relevant to the claim construction analysis." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at

1582). The specification is dispositive when the inventor uses it to explicitly define a

claim term, in which case "the inventor's lexicography governs." *Id.* at 1316. But even

where the specification does not explicitly define a term, it may do so implicitly, *id.* at

1321, and in any event is a "concordance for the claims," *id.* at 1315 (citation omitted),

on which the court should "rely heavily." *Id.* at 1317. At the same time, a court must toe

a fine line "between using the specification to interpret the meaning of a claim and

ORDER – 5

1   importing limitations from the specification into the claim." *Id.* at 1323; *see also SciMed*
2   *Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir.
3   2001) (describing "reading a limitation from the written description into the claims" as
4   "one of the cardinal sins of patent law").

5       The final source of "intrinsic evidence" bearing on claim interpretation is the
6   patent's prosecution history. *Phillips*, 415 F.3d at 1317. The prosecution history begins
7   with the inventor's application to the United States Patent and Trademark Office
8   ("PTO"), and includes all communication between the inventor and the PTO, culminating
9   in the PTO's decision to issue the patent. *Vitronics*, 90 F.3d at 1582. An inventor must
10  often disclaim part of the scope of an invention during prosecution to obtain a patent.
11  Where the prosecution history reflects a "clear and unmistakable disavowal of scope," a
12  court must construe the claims accordingly. *Purdue Pharma L.P. v. Endo Pharms., Inc.*,
13  438 F.3d 1123, 1136 (Fed. Cir. 2006). The court must recognize, however, that "the
14  prosecution history represents an ongoing negotiation between the PTO and the
15  applicant," and thus "often lacks the clarity of the specification." *Phillips*, 415 F.3d at
16  1317. It is nonetheless useful for claim construction, although less so than the
17  specification. *Id.*

18      Extrinsic evidence is always "less significant" and in general "less reliable" than
19  intrinsic evidence. *Id.* at 1318. Unlike intrinsic evidence, extrinsic evidence is not
20  "created at the time of patent prosecution for the purpose of explaining the patent's scope
21  and meaning." *Id.* Expert evidence, in particular, is "generated at time of and for the
22  purpose of litigation and thus can suffer from bias that is not present in intrinsic
23  evidence." *Id.* The court has discretion to use extrinsic evidence in claim construction,
24  but need not do so. *Id.* at 1319. Indeed, where the intrinsic evidence is adequate to
25  define a claim term, "it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at
26  1583; *Trilogy Communs., Inc. v. Times Fiber Communs., Inc.*, 109 F.3d 739, 744 (Fed.

27  ORDER – 6
28

Cir. 1997) ("When . . . district court has concluded that the patent specification and prosecution history adequately elucidate the proper meaning of claims, expert testimony is not necessary and certainly not crucial.").

With these basic interpretative principles in mind, the court turns to the disputed claim terms of the '181 Patent.

## A. The "Input Device" Need Not Be "Responsive to Human Manipulation."

The parties agree that the "input device" disclosed in the preambles to claims 4 and 19 is an "apparatus for providing information to a computing device." Their disagreement is that Triton Tech believes that the input device must also be "responsive to human manipulation." That limitation appears nowhere in the claims.

The preferred embodiment of the invention is a handheld mouse. But embodiments, even preferred embodiments, do not limit claims. *Phillips*, 415 F.3d at 1323; *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (rejecting "an attempt to import a feature from a preferred embodiment into the claims"). As Triton Tech points out, the Patent discloses no embodiments that are not "responsive to human manipulation." In addition to the mouse of the preferred embodiment, it discloses that "other variations are possible," including a device "mounted on a helmet to detect head movements" and "foot and/or leg-mounted" devices. 11:44-49.[3] But the Patent discloses those possibilities without limitation, noting that "[o]ther arrangements will also be apparent to the skilled practitioner." 11:50-51. The court is not a skilled practitioner, but the patent discloses no prohibition on an input device attached to, for example, a pet or a weather vane. The Patent does not limit the "input device" to those that are "responsive to human manipulation."

---

[3] Except when citing claims or figures, the court uses column and line numbers to cite the patent-in-suit. The citation "'2:46-49," for example, refers to lines 46-49 of column 2 of the '181 Patent.

ORDER – 7

The court construes "input device" to mean "an apparatus for providing information to a computing device."

**B.      The Phrase "Associated with [the Claimed] Input Device" Does Not Limit the Location of the Associated Component.**

Claims 4 and 19 both require "integrator means" and "communication means" that are "associated with [the claimed] input device."  Claim 4 also requires an "analog-to-digital converter" that is "associated with said input device . . . ."  The parties agree that the latter phrase means "located within the input device or an ancillary components area."  Their dispute is that Nintendo believes that the ancillary components area must be "external to the computing device," whereas Triton Tech does not.

The court generally prefers not to disturb the parties' agreed-upon constructions, but in this case, they both misinterpret the phrase "associated with [the claimed] input device" to limit the *location* of the associated integrator means, communication means, or analog-to-digital converter.  The Patent's inventor had no difficulty expressing claim limitations that require a specific location of components.  For example, claims 4 and 19 both require a "housing" and require the acceleration sensors and rotational rate sensors to be "in said housing . . . ."  By contrast, the integrator means, communication means, processing means, and analog-to-digital converter need merely be "associated with" the input device.

The specification dispels any interpretation that turns "associated with" into a location limitation.  It describes a "motion sensing assembly" consisting of the six sensors (6:3-12) along with an "ancillary components area" that may contain a sensor interface, analog-to-digital converter, and processing element, among other components. *See* 6:37-40 ("Sensor signals from the individual components of the motion sensing assembly . . . are provided to circuits in the ancillary components area . . . which performs processing of the sensor signals.").  The integrator means, processing means, and analog-to-digital converter are all components located in the ancillary components

ORDER – 8

area.  The specification explicitly declines to limit the location of the ancillary components area.  In the preferred embodiment, it is located within the mouse.  5:62-65; Figs 1(a)-(c), 2(a)-(c).  But "components included in the ancillary components area . . . may be contained within a separate chassis remote from the mouse . . . ."  5:66-68.  Nothing in the specification excludes any location for the ancillary components.

Nintendo attempts to prop up its interpretation with the prosecution history, which reveals that the inventor added the "associated with" limitations in response to a PTO action which rejected all of the claims as indefinite.  Hamilton Decl. (Dkt. 118-1), Ex. 2, ¶ 6.  Among the PTO examiner's criticisms were that he could not distinguish how the claimed integrator means, communication means, and processing means were interconnected with other portions of the device.  *Id.* ¶¶ 6-9, 12.  He asked several questions about the location of various subcomponents.  *Id.*  When the inventor responded, he did so with claims that included (for the first time) elements describing the location of the sensors and including the "associated with the input device" limitations that are at issue.  *Id.*, Ex. 3, at 2-6.  In explaining the amendments, however, the inventor pointed out that whereas he was limiting the location of the sensors, he was generally *not* limiting the location of the integrator means, communication means, or processing means.  He pointed out the location of communication means in the preferred and alternate embodiments, but explained that the claims were "not intended to be limited to either specific embodiment," and that the amended claim "properly interconnects the communication means with the remaining structure without unduly limiting the scope of the claim."  *Id.* at 9-10.  He pointed out that the integrator means was separate from the acceleration sensors, but otherwise declined to limit the location of that means.  *Id.* at 10.  As to the analog-to-digital converter, he similarly declined to limit its location.  *Id.*  Nintendo contends that the prosecution history favors its interpretation of "associated with said input device," but the court disagrees.  Instead, the prosecution history shows

ORDER – 9

the inventor refusing to limit the location of the components at issue, instead merely requiring that they be "associated with the input device."

Whereas the phrase "associated with" does not limit location, the court cannot construe it to be meaningless. The inventor did not append the phrase to every component in claims 4 and 19 (for example, the claimed "buffer memory" is not explicitly "associated with" anything), which strongly suggests he intended it to mean something. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *cf. Power Mosfet Techs., L.L.C. v. Seimens AG*, 378 F.3d 1396, 1409-10 (Fed. Cir. 2004) (noting that constructions that render a term superfluous are "disfavored," but permissible where the specification demands). Here, the inventor chose to make some components "associated with the input device," which in the court's view merely excludes implementations that are not associated with the input device. For example, if the computer with which the input device communicates had software that was capable of converting linear acceleration and rotational rate information (from any source) into positional and attitudinal data, but that software was not associated with the input device, it would not be within the scope of the Patent. On the other hand, if the input device came with software to be loaded onto a computer, and the software was designed to convert data from the input device, then it would be within the scope of the Patent. Indeed, the specification discloses that the processes necessary to convert the sensor signals to usable positional and attitudinal data are "preferably implemented in hardware," but that practitioners would recognize that "software implementations of some processes [are] also possible." 8:52-56.[4]

---

[4] The disclosure of software-implemented integration means is a further reason to doubt Nintendo's preferred construction. If the inventor meant to permit software implementations while prohibiting them from residing on a particular computer, the court expects that he would have said so.

ORDER – 10

For these reasons, the court construes the phrase "associated with [the claimed] input device" to mean "having an association with the input device, as opposed to merely an association with the computing device (or other device)." The phrase does not limit the location of the component with which it is associated.

### C. The Claims Themselves Suffice to Define the Claimed Acceleration Sensors and Rotational Rate Sensors.

Claims 4 and 19 not only require three linear acceleration sensors and three rotational rate sensors, they specify their interconnected functions. For example, claim 19 requires as follows:

> a third acceleration sensor provided in said housing and oriented perpendicular to said first and second acceleration sensors for detecting acceleration along a third axis perpendicular to said first and second axes and producing electrical signals having values proportional to the detected acceleration

It also requires the following:

> a third rotational rate sensor provided in said housing for directly detecting rotation about said third axis and producing analog signals having values proportional to the detected rate of rotation

It discloses similar requirements for first and second acceleration sensors and rotational rate sensors, thus describing not only a group of six functional components, but requiring that they be positioned in a particular manner with respect to each other. A person unfamiliar with the jargon of three-dimensional geometry or physics might prefer a different explanation of these requirements (perhaps one with diagrams or animation), but the court discerns no other reason to depart from the plain language of the claims. Nintendo agrees.

Triton Tech, by contrast, prefers the following interpretation: "an electrical structure that detects and measures the linear [or rotational] acceleration upon the electrical structure." That interpretation will not suffice, as it wholly ignores the requirement of three separate sensors oriented in a particular way with respect to each other. It also will not suffice with respect to the rotational rate sensors because it is

ORDER – 11

1    functionally inaccurate.  The claimed sensors measure "rotational rate" (*i.e.*, the number

2    of rotations per unit of time), not rotational acceleration (*i.e.*, the change in the rotational

3    rate per unit of time).

4           The only justification Triton Tech offers for its preferred construction is that

5    "modern acceleration sensors are often composed of a single chip that provides multiple

6    outputs relating to the different axes' linear acceleration."  Pltf.'s Br. (Dkt. 115) at 9.  The

7    court cannot comment on the properties of modern acceleration sensors, but if they are

8    not comprised of three sensors measuring acceleration along three mutually perpendicular

9    axes, they are not the acceleration sensors claimed in the '181 Patent.

10          The court provides no construction for the acceleration sensors and rotational rate

11   sensors of the '181 Patent beyond that disclosed in claims 4 and 19.  If it were necessary,

12   the court would consider a less jargon-dependent version for the purpose of instructing

13   the jury.  The court rejects Triton Tech's preferred construction because it finds no

14   support in the specification, no support in the law, and is inaccurate as to the function of

15   the rotational rate sensors.

16   **D.    Two of the Three Disputed Means-Plus-Function Terms Are Indefinite.**

17          The parties' remaining disputes center around claim elements that are phrased in

18   means-plus-function format.  The Patent Act permits a patentee to claim an element of an

19   invention merely by describing its function in a claim.  35 U.S.C. § 112(f).  But in order

20   to gain the advantage of pure functional claiming, a patentee must disclose in the

21   specification a structure, material, or act that fulfills the claimed function.  *Id.*; *see also*

22   *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir.

23   2003) ("The duty of a patentee to clearly link or associate structure with the claimed

24   function is the *quid pro quo* for allowing the patentee to express the claim in terms of

25   function under section 112 . . . .").  A means-plus-function claim that lacks a

26   corresponding structure in the specification is indefinite, and thus invalid.  *Biomedino,*

27   ORDER – 12

28

1   *LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007) (noting that

2   determination of indefiniteness is a legal conclusion in the same way that the court's

3   interpretation of a claim's meaning is a legal conclusion).

4        Once a court has identified a means-plus-function claim term, it must clarify what

5   function the term recites, and then must hunt in the specification for structure that fulfills

6   the stated function. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258

7   (Fed. Cir. 1999). A means-plus-function claim encompasses "all structure in the

8   specification corresponding to that element and equivalent structures." *Id.*

9        Nintendo and Triton Tech agree that claims 4 and 19 contain three means-plus-

10  function elements. One is the "communication means" that is the final element of each

11  claim. Another is the "integrator means" that precedes the "communication means" in

12  both claims. The "integrator means" also appears, with additional functional

13  requirements, in claim 5. The third is the "processor means" of claim 13.

14       **1.    Communication Means**

15       The claims plainly disclose the function of the claimed "communication means."

16  It serves to "communicat[e] information between [the claimed] input device and [the]

17  computing device." No party argues that this functional description is unclear.

18       The parties also agree that the specification discloses structure corresponding to

19  the claimed "communication means." The specification discloses six interface ports, one

20  of which appears on each of the six surfaces of the claimed input device. 5:6-23; Figs.

21  1(a)-(d). The specification also discloses an alternative communication means – an

22  "interface cable." 5:23-25; Fig. 1(d).

23       The only dispute is that Triton Tech believes that the claim covers not merely the

24  six-interface-port configuration that the specification discloses, but more generically a

25  "uni-directional or bi-directional wireless interface." To support that contention, Triton

26  Tech points to the specification's disclosure of a "wireless interface" that is "[p]referably

27  ORDER – 13

28

. . . bi-directional." 4:8-17. That disclosure, however, does not disclose a structure, it merely discloses an alternate phrasing of the claimed function. That much is demonstrated in the remainder of the specification. The only "wireless interface" to which the specification points is illustrated in figure 3, which purports to illustrate "major functional elements" of the claimed invention. 6:33-35. Whereas the figure does illustrate, in block-diagram format, several physical components of the invention, the wireless interface is not among them. Instead, the "wireless interface" is illustrated with a schematic lightning bolt between the transceiver of the invention (comprised of the six interface ports) and the transceiver of the computer. Fig. 3. A lightning bolt is not a stand-in for structure, it is a pictorial representation of a function – communicating wirelessly. The only structure identified for performing that function is the six interface ports. 6: 35-36 (referring to figure 3 and designating "wireless interface" as the "mouse transceivers" that correspond to the six interface ports).

The court thus construes the "communication means" as the six interface ports, or a single cable, or their equivalents.

### 2.    Integrator Means

The "integrator means" performs the function of "integrating [various signals] over time to produce [other signals]." The signals to be integrated and the resulting signals vary between claim 4 and claim 19, but no one disputes that the claims adequately disclose the function of the integrator means. Claim 5 elaborates on claim 4 by requiring that the integrator means "numerically integrate[]" the "digital acceleration sensor values."

The specification points to structure for performing integration: a "conventional microprocessor having a suitably programmed read-only memory" or a "suitably programmed conventional digital signal processor." 7:15-19. Triton Tech believes that

ORDER – 14

disclosure suffices.  Nintendo believes that the disclosure is inadequate as a matter of law to satisfy the requirements of a means-plus-function claim.

Nintendo relies largely on *Aristocrat Techs. Austr. Pty Ltd. v. Int'l Gaming Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008), in which the court extended precedent that requires an inventor claiming a computer-implemented aspect of his invention in means-plus-function format to do more than "simply [point to] a general purpose computer or microprocessor."  In *Aristocrat*, the inventor claimed a video slot machine that included a "control means" to accomplish various game functions.  *Id.* at 1330.  The specification disclosed only a "standard microprocessor" with "appropriate programming" to accomplish those functions.  *Id.* at 1333.  The court explained that without a disclosure of an algorithm that the microprocessor would carry out to accomplish the disclosed function, the specification did not limit the claim, and the claim amounted to "pure functional claiming."  *Id.*; *see also id.* at 1334 ("The reference to 'appropriate programming' imposes no limitation whatever, as any general purpose computer must be programmed.").

Triton Tech does not address *Aristocrat*.  Indeed, with the exception of a single district court case, it cites no law at all in support of its assertion that the Patent's specification adequately discloses a structure corresponding to the integrator means. Instead, it insists that a person of ordinary skill in the art would know how to "suitably program" a microprocessor to accomplish the functions of the integrator means.  The argument it makes is one that the *Aristocrat* court squarely rejected.  The court explained that whether a person of ordinary skill in the art could practice the invention based on the specification's disclosures was a question of enablement rather than a question of indefiniteness.  *Aristocrat*, 521 F.3d at 1336 (noting that the inventor's argument "conflates the requirement of enablement under [35 U.S.C. § 112(a)] and the requirement to disclose the structure that performs the claimed function under [35 U.S.C. § 112(f)]").

ORDER – 15

1    In other words, even if a patent is properly enabled, it must still satisfy the "*quid pro*

2    *quo*" of the mean-plus-function format.

3        *Aristocrat* controls the outcome of this dispute.  Like the inventor in that case,

4    Triton Tech can point only to a "suitably programmed" microprocessor.  It discloses no

5    algorithm to program into that microprocessor to perform the functions of the integrator

6    means.  At both claim 5 and in numerous places in the specification, the patent discloses

7    "numerical integration" as a method of accomplishing those functions.  "Numerical

8    integration," however, is not a single algorithm, but rather a whole class of algorithms

9    that can be used to calculate definite integrals for various functions.  Although a person

10   of skill in the art might be able to choose an appropriate numerical integration algorithm

11   and program it onto a microprocessor, the Patent discloses no algorithm at all.  The court

12   therefore concludes that the '181 Patent does not adequately disclose a structure

13   corresponding to the claimed "integrator means."

14       **3.    Processing Means**

15       The "processing means" of claim 13 serves the function of "compensating for

16   acceleration detected by [the claimed] acceleration sensors attributable to gravitational

17   acceleration forces."  Again, no one disputes that the claim adequately defines the

18   function of the processing means.

19       Again, however, Triton Tech points to the same "suitably programmed"

20   processors to satisfy its disclosure obligations.  For the reasons the court has just

21   discussed, that disclosure is inadequate.

22                           **IV.  CONCLUSION**

23       The court construes the disputed claims of the patents-in-suit as described above.

24   Given the court's conclusion that the "integrator means" and "processing means" are

25   indefinite, each of the asserted claims is indefinite.  Ordinarily, the court would dismiss

26   Triton Tech's patent infringement claims and enter judgment for Nintendo.  No party,

27

28   ORDER – 16

however, has requested a particular disposition. The court therefore orders that no later than June 20, 2013, the parties shall submit a joint statement regarding the disposition of this case. The parties shall not use the joint statement as a forum for reconsidering the court's claim construction.

DATED this 4th day of June, 2013.

_Richard A Jones_

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 17

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRITON TECH OF TEXAS, LLC,

      Plaintiff,

      v.

NINTENDO OF AMERICA, INC.,

      Defendant.

NO. C13-157RAJ

ORDER

The court has considered the parties' joint statement in response to the court's June 4 order. In that order, the court found each of the asserted claims of the patent-in-suit to be indefinite. It observed, however, that no party had actually requested that the court dismiss the case. The court requested further input from the parties.

Defendant asks the court to dismiss the case with prejudice and enter judgment accordingly. That is precisely the relief the court would have awarded in its June 4 order, had Defendant requested it.

Plaintiff's position is unusual. It contends that the June 4 order left nothing to be decided, and that it is therefore an appealable judgment. At the same time, however, it contends that the court should stay this case (despite the court's alleged entry of an appealable judgment) so that it can appeal. Plaintiff has not asked for entry of judgment, and the court disagrees that its June 4 order is the equivalent of a judgment. The court is aware of no basis for a stay.

ORDER – 1

1    In light of the parties' joint statement, the court finds no reason to delay entry of

2    judgment. For the reasons stated in the June 4 order, it finds the asserted claims of the

3    patent-in-suit to be indefinite, and thus invalid. The court directs the clerk to dismiss this

4    case with prejudice, and to enter judgment for Defendant.

5    DATED this 27th day of June, 2013.

*Richard A Jones*
_____
The Honorable Richard A. Jones
United States District Court Judge

ORDER – 2

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

TRITON TECH OF TEXAS, LLC,

     Plaintiff,

     v.

NINTENDO OF AMERICA, INC.,

     Defendant

**JUDGMENT IN A CIVIL CASE**

Case No. C13-157RAJ

___ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

_X_ **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

THE COURT HAS ORDERED THAT:

For the reasons stated in its June 4, 2013 order, the court dismisses this case with prejudice.

Dated this 27th day of June, 2013.

WILLIAM M. McCOOL
_____
Clerk

s/ Consuelo Ledesma
_____
Deputy Clerk